IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JUAN CARRERA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:04cv3062 |
| | ) | |
| vs. | ) | MEMORANDUM AND ORDER |
| | ) | |
| NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES, et al., | ) ) ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on filing no. 61, the defendants' Motion to Dismiss the complaint filed by the plaintiff, Juan Carrera, a prisoner in the custody of the Nebraska Department of Correctional Services ("DCS"). The plaintiff asserts federal civil rights claims pursuant to 42 U.S.C. §§ 1983, 1985 and 1986, and he seeks monetary, declaratory and injunctive relief from the defendants in their individual and official capacities. The plaintiff alleges violations of the Eighth Amendment to the United States Constitution and deprivations of due process by the defendants, who were employees of DCS at the pertinent time. According to the plaintiff, the defendants failed to protect the plaintiff from injury by another inmate, and they subjected the plaintiff to unduly prolonged administrative confinement, without procedural due process, after the other inmate attacked the plaintiff.[1]

In their Motion to Dismiss, the defendants contend that the complaint fails to state a claim on which relief may be granted under the Eighth Amendment to the U.S.

---

[1]The plaintiff elected to dismiss a prior action, Case No. 4:02cv3152 (D. Neb.), based on the same facts, in order to exhaust administrative remedies regarding all claims before filing the above-entitled action. See 42 U.S.C. § 1997e(a) of the Prison Litigation Reform Act ("PLRA").

1

Constitution or the Due Process Clause of the Fourteenth Amendment. In addition, the defendants, in their official capacity, claim sovereign immunity from suit in federal court, and they assert qualified immunity from damages, in their individual capacity.

**Background**

Accepting the factual allegations of the complaint as true, the plaintiff, in August and September of 1997, notified staff at the Lincoln Correctional Center ("LCC"), where he was housed, that another inmate, Domingo Sepulveda, had a "vendetta" against him. Nevertheless, DCS transferred Sepulveda to LCC in September of 1997. When the plaintiff protested to defendant-Darlene Percival, she stated that there was no other facility in which Sepulveda could be placed, and the two should try to work matters out.

Two and one-half years later, Domingo Sepulveda and another inmate, Jesse Lopez, attacked the plaintiff near a dining area at LCC, on January 7, 2000, resulting in assignment of Sepulveda and Lopez to segregation. Shortly thereafter, on January 18, 2000, Lopez managed to attack the plaintiff in a shower area. In discussions with staff during January of 2000, the plaintiff explained that he and Domingo Sepulveda were "enemies," that they could not be "sociable with each other," and that future conflicts were inevitable because of Sepulveda's vendetta. Because the plaintiff lacked eligibility for a transfer, his request to be transferred to another DCS facility was denied.

On February 3, 2000, when the plaintiff heard that Sepulveda had been released from segregation and placed in the plaintiff's housing unit, the plaintiff immediately complained to staff. Although the staff members did not express much sensitivity to the plaintiff's concerns, Sepulveda was assigned to another housing unit at LCC the same day.

A major altercation involving many inmates occurred on April 23, 2000 in the LCC

"big yard." During that brawl, Sepulveda attacked the plaintiff with a baseball bat. The plaintiff grabbed an amputee's crutch to ward off the blows, and ultimately, he was saved by another prisoner, after the staff member on duty had to flee the area. Finally, tower guards fired shots; two emergency response teams restored order, and the facility was locked down. Some inmates went to the hospital, some to holding cells, and some, including the plaintiff, to immediate segregation. Shortly thereafter, DCS transferred Sepulveda to the Nebraska State Penitentiary.

The plaintiff received a misconduct report for his involvement in the altercation, and he remained in segregation pending completion of an investigation. Subsequently, on May 11, 2000, the Institutional Disciplinary Committee dismissed the misconduct report after testimony by staff that the plaintiff had not been an aggressor in the April 23rd incident.

However, on May 11, 2000, the plaintiff received notice that he would be considered for placement on administrative confinement, a security classification involving nondisciplinary segregation. The plaintiff requested staff representation at his classification hearing, but the request was denied. After the classification hearing, and notwithstanding dismissal of the misconduct report, the plaintiff was assigned to administrative confinement. The reasons given included the safety and security of the institution and because of his involvement in the April 23rd altercation. A later explanation referred to the plaintiff's participation in one of the "rival criminal threat groups" involved in the April 23rd fight. On October 1, 2001, the Warden of LCC informed the plaintiff that confidential informants had named the plaintiff as a major gang member. The plaintiff does not state precisely how long he remained on administrative confinement. However, he protested and appealed his reclassification through October 31, 2001.

**Sovereign Immunity**

The defendants correctly assert that in their official capacity, they are not subject to suit in federal court. A suit against a public employee in his or her official capacity is actually a suit against the public employer. Kentucky v. Graham, 473 U.S. 159, 165 (1985). Therefore, a claim against a state employee, in his or her official capacity, is in reality a claim against the state itself, as the entity that employs the officer.

State sovereign immunity, recognized and preserved by the Eleventh Amendment to the U.S. Constitution, prohibits a plaintiff from suing a state, state agency or state employee in the employee's official capacity, except insofar as the state or the Congress of the United States has abrogated the state's sovereign immunity. See, e.g., Morstad v. Department of Corrections and Rehabilitation, 147 F.3d 741, 744 (8th Cir. 1998): "[A]bsent a waiver, the Eleventh Amendment immunizes the state and its officials from § 1983 liability." See also Burk v. Beene, 948 F.2d 489, 492-93 (8th Cir. 1991): "Eleventh Amendment jurisprudence is well-settled: 'a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment.'..." (Citations omitted.)

Furthermore, "[a] State's constitutional interest in its sovereign immunity encompasses not merely *whether* it may be sued, but *where* it may be sued." Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 99 (1984) (emphasis in original). See also Becker v. University of Nebraska, 191 F.3d 904, 908 (8th Cir. 1999): "This court has previously held that the State of Nebraska has not consented to federal court jurisdiction." See also Hess v. Port Authority Trans-Hudson Corp., 513 U.S. 30, 39-40 (1994): "The Eleventh Amendment largely shields States from suit in federal court without their consent,

4

leaving parties with claims against a State to present them, if the State permits, in the State's own tribunals." Accord Trevelen v. University of Minnesota, 73 F.3d 816, 818 (8th Cir. 1996): "The Supreme Court has interpreted the Eleventh Amendment to bar actions in federal court against a state by its citizens." The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court.[2] Board of Trustees of Univ. of Alabama v. Garrett, 531 U.S. 356, 363 (2001).

### Due Process

The plaintiff asserts that the defendants deprived him of liberty without due process in two respects. He objects to the defendants' consideration of information in the dismissed or expunged misconduct report in connection with their decision to reclassify him

---

[2]The Neb. Const. art. V, § 22, provides that "[t]he state may sue and be sued, and the Legislature shall provide by law in what manner and in what courts suits shall be brought." "This constitutional provision, however, is not self-executing and requires legislative action to waive the State's sovereign immunity." King v. State, 614 N.W.2d 341, 346 (Neb. 2000). For example, the Nebraska Legislature has waived sovereign immunity for certain kinds of tort actions against the state and its agencies. See the Nebraska State Tort Claims Act, Neb. Rev. Stat. §§ 81-8,209 *et seq.* However, the waiver of sovereign immunity under the State Tort Claims Act does not extend to actions maintained in federal court. See Neb. Rev. Stat. § 81-8,214: "Suits shall be brought in the district court of the county in which the act or omission complained of occurred or, if the act or omission occurred outside the boundaries of the State of Nebraska, in the district court for Lancaster County." Thus, section 81-8,214 is a limited waiver of sovereign immunity which permits an action against the state or a state agency exclusively in state district court.

In addition, Neb. Rev. Stat. § 84-911 permits a declaratory judgment to determine the validity of a rule or regulation. However, such an action may be brought only in the District Court of Lancaster County, Nebraska. Similarly, Neb. Rev. Stat. § 20-148 does not authorize suits in federal court for alleged civil rights violations by the state. Patteson v. Johnson, 367 N.W.2d 123, 126 (Neb. 1985). See also Wiseman v. Keller, 358 N.W.2d 768, 771 (Neb. 1984): "[S]ince the statute [§ 20-148] is silent as to allowing suit in federal court and the legislative history indicates it was intended as a state remedy, we conclude that even if the statute permitted suit against the state, that suit could only be brought in state court."

to administrative confinement. The plaintiff also complains that the defendants denied his request for staff assistance at the reclassification hearing, as he needed help to resist reclassification based on improper criteria, i.e., the dismissed misconduct report.

However, the plaintiff's due process claim must fail, as the Due Process Clause is not implicated in the circumstances of the plaintiff's case. "The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." Wilkinson v. Austin, 125 S.Ct. 2384, 2393 (2005). Thus, claims regarding the right to either procedural or substantive due process must begin with identification of a protected liberty or property interest. Singleton v. Cecil, 176 F.3d 419, 424-25, 425 n. 7 (8th Cir.) (*en banc*), cert. denied, 120 S.Ct. 402 (1999).

In order to constitute a liberty interest, an individual must have a legitimate claim or entitlement to the subject of the deprivation which rises to more than a unilateral hope, or expectation. Kentucky Dept. of Corrections v. Thompson, 490 U.S. 454, 459 (1989). A protected liberty interest may arise from either the Due Process Clause of the U.S. Constitution, itself, or from a state-created statutory entitlement. Hewitt v. Helms, 459 U.S. 460, 466 (1983); Fraise v. Terhune, 283 F.3d 506, 522 (3d Cir. 2002) (citations omitted).

Liberty Inherent in the Due Process Clause

The Due Process Clause of its own force does not afford a prisoner a liberty interest in remaining in the general prison population. Lekas v. Briley 405 F.3d 602, 607 (7th Cir. 2005). See also Holly v. Woolfolk, 415 F.3d 678, 2005 WL 1661528 at *1 (7th Cir. 2005) ("being placed in segregation is too trivial an incremental deprivation of a convicted prisoner's liberty to trigger the duty of due process"). Accord Christianson v. Clarke, 932

6

F. Supp. 1178, 1182 (D. Neb. 1996) ("[T]he Due Process Clause itself does not protect any liberty interest in remaining free from administrative segregation or protective custody."). "[T]he notion of liberty inherent in the Fourteenth Amendment Due Process Clause is not implicated by" a placement or transfer which subjects a convicted prisoner to more severe conditions of confinement, without more.  Cf.  Meachum v. Fano, 427 U.S. at 225  ("That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules.").[3]

State-Created Liberty Interest

Consequently, the plaintiff's liberty interest, if any, must emanate from state law. The plaintiff's claim to a state-created liberty interest is governed by the Supreme Court's decision in Sandin v. Conner, 515 U.S. 472 (1995).  "Sandin found no liberty interest protecting against a 30-day assignment to segregated confinement because [the assignment] did not 'present a dramatic departure from the basic conditions of [the inmate's] sentence.'" Wilkinson v. Austin, 125 S.Ct. at 2394, *quoting* Sandin, 515 U.S. at 485.

In Sandin, the Court substantially narrowed the circumstances in which a state-created liberty interest arises:

---

[3]For a convicted state prisoner, a liberty interest traceable to the Due Process Clause itself, instead of to state law, is limited only to freedom from restraints which "exceed[ ] the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force." Sandin v. Conner, 515 U.S. 472, 484 (1995). "Examples would be involuntary administration of psychotropic medication, see Washington v. Harper, 494 U.S. 210, 221-22 ... (1990), or involuntary transfer to a state mental hospital for treatment, see Vitek v. Jones, 445 U.S. 480, 494 ... (1980)." Mitchell v. Horn, 318 F.3d 523, 531 n. 4 (3d Cir. 2003), *citing* Sandin, 515 U.S. at 484.

7

> The time has come to return to the due process principles we believe were correctly established and applied in Wolff and Meachum. Following Wolff, we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause .... But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

Id. at 483-84 (citations omitted). Therefore, to demonstrate a liberty interest created by state law, the plaintiff must show that the protested conditions exceed the normal range and limits of custody and impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id.

However, the Eighth Circuit has "consistently held that administrative and disciplinary segregation are not atypical and significant hardships under Sandin." Portley-El v. Brill, 288 F.3d 1063, 1065 (8th Cir. 2002). Accord Kennedy v. Blankenship, 100 F.3d 640, 642 n. 2, 643 (8th Cir.1996) (placement in punitive isolation was not an atypical and significant deprivation even though the prisoner faced restrictions in privileges regarding mail, telephone, visitation, commissary, and personal possessions). See also Phillips v. Norris, 320 F.3d 844, 847 (8th Cir. 2003): "We have consistently held that a demotion to segregation, even without cause, is not itself an atypical and significant hardship." The absence of contact visitation, exercise privileges, and chapel rights for 37 days did not constitute an atypical and significant hardship. Id.

In Nebraska, deprivation of good-time credit implicates a liberty interest sufficient to require due process. Dailey v. Nebraska Dept. of Corr. Servs., 578 N.W.2d 869, 873 (1998). See generally Wolff v. McDonnell, 418 U.S. 539, 557-58 (1974) (when a state provides a right to good time and specifies the methods of forfeiture, an inmate has a

8

constitutionally-protected liberty interest entitling him or her to procedures designed to ensure that the state-created right is not arbitrarily abrogated).

On the other hand, the Nebraska courts have rejected the argument that segregation alone constitutes an atypical and significant hardship giving rise to a liberty interest under state law. See, e.g., Martin v. Curry, 690 N.W.2d 186, 192 (Neb. App. 2004) (inmate had no clearly established liberty interest when prison officials extended his tentative release date from disciplinary segregation and placed him on administrative confinement). See also Thompson v. Nebraska Dept. of Correctional Services, 2002 WL 857327 at *6 (Neb. App. May 7, 2002): "Thompson has no protected liberty interest that was violated by her placement in disciplinary segregation. Disciplinary segregation alone is not an atypical and significant hardship, and Thompson does not have a state-created right that is being arbitrarily abrogated, because her good time is not affected."

Allegations of Conspiracy

In the absence of an "atypical and significant hardship," a change in conditions of confinement does not inflict an injury cognizable under the Due Process Clause, even if prison officials harbor punitive motives. The Court in Sandin rejected the argument that action taken for punitive purposes necessarily implicates a liberty interest: "Conner asserts, incorrectly, that any state action taken for a punitive reason encroaches upon a liberty interest under the Due Process Clause even in the absence of any state regulation." Sandin v. Conner, 515 U.S. at 484 (distinguishing convicted prisoners from pretrial detainees who "may not be punished prior to an adjudication of guilt in accordance with due process of law"). As to convicted prisoners, "[d]iscipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence

9

imposed by a court of law." Id. at 485.

Thus, a plaintiff's accusations of conspiracy or improper motive cannot create a liberty interest where none otherwise exists. The factors bearing on whether placement in segregation imposes the kind of atypical and significant hardship which gives rise to a liberty interest are objective, i.e.: (1) the conditions of confinement in segregation; (2) the length of time spent in segregation; and (3) the effect, if any, on the duration of the prisoner's incarceration. Sandin v. Conner, 515 U.S. at 486-87.

In Wilkinson v. Austin, 125 S.Ct. 2384 (2005), for example, despite the usual rule that an interprison transfer to a maximum security facility with less favorable conditions is within the normal limits of a conviction, transfer to Ohio's "Supermax facility (OSP)," unquestionably gave rise to a liberty interest under the principles expressed in Sandin. Conditions there are more restrictive than any other form of incarceration in Ohio, including conditions on death row. Id. at 2389. Placement at OSP lasts for an indefinite period, limited only by an inmate's maximum prison term, and parole eligibility while at OSP is suspended. Id.[4]

---

[4]"For an inmate placed in OSP, almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room. Save perhaps for the especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities, but here there are two added components. First is the duration. Unlike the 30-day placement in Sandin, placement at OSP is indefinite and, after an initial 30-day review, is reviewed just annually. Second is that placement disqualifies an otherwise eligible inmate for parole consideration.... **While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context**. It follows that respondents have a liberty interest in avoiding assignment to OSP." Wilkinson v. Austin, 125 S.Ct. 2384, 2394-95 (2005) (emphasis added).

Taking judicial notice of the court's records in similar disputes, the conditions in segregation and administrative confinement at the state's prisons are virtually identical, and those conditions are far more severe than inmates experience in the general prison population at DCS facilities. Nevertheless, the conditions of confinement in DCS segregation do not approximate the isolation described in Wilkinson v. Austin, 125 S.Ct. at 2394-95. In addition, unlike the plaintiffs in Wilkinson v. Austin, placement in administrative confinement did not affect the duration of the plaintiff's incarceration.

As for the third Sandin factor, the length of time the plaintiff remained in administrative confinement, the courts have not developed a consensus regarding how much time in segregation can be considered an atypical and significant hardship. On the outer end of the spectrum, "indefinite" placement in segregation may amount to a deprivation of a liberty interest within the meaning of Sandin, i.e., an atypical and significant hardship. Wilkinson v. Austin, 125 S.Ct. at 2394-95. The Third Circuit Court of Appeals held in Shoats v. Horn, 213 F.3d 140, 144 (3d Cir. 2000), that eight years in administrative confinement, during which the plaintiff remained locked in his cell for all but two hours per week, was denied contact with his family, visits to the library and participation in any education, vocational, or other activities, clearly implicated a protected liberty interest.

However, the same Court of Appeals has held that administrative confinement for fifteen months did not impose an atypical and significant hardship. Griffin v. Vaughn, 112 F.3d 703, 706 (3d Cir. 1997). Similarly, in Jones v. Baker, 155 F.3d 810, 813 (6th Cir. 1998), the Sixth Circuit did not consider confinement in administrative segregation for two and one-half years an atypical and significant hardship.

In this case, the plaintiff's period in segregation was relatively short in contrast to

11

cases in which courts have found a liberty interest warranting due process protection. The conditions in this case were not "outside the ordinary realm of what is to be expected of prison life,"[5] and the placement in administrative confinement had no effect on the overall duration of the plaintiff's period of imprisonment. The plaintiff had no liberty interest arising under the Due Process Clause itself or state law, and, therefore, he did not suffer a deprivation of liberty entitling him to the protections of the Due Process Clause.

### Process Due

Even if the plaintiff had a constitutionally-protected liberty interest, he would not have been entitled to the specific procedural safeguards which are the subject of his complaint. In the context of prisoner security classifications, as opposed to disciplinary proceedings, an inmate is entitled only to informal, nonadversary procedural protections. See Wilkinson v. Austin, 125 S.Ct. at 2397:

> Where the inquiry draws more on the experience of prison administrators, and where the State's interest implicates the safety of other inmates and prison personnel, the informal, nonadversary procedures set forth in Greenholtz v. Inmates of Neb. Penal and Correctional Complex, 442 U.S. 1 ... (1979), and Hewitt v. Helms, 459 U.S. 460 ... (1983), provide the appropriate model. Greenholtz, supra, at 16, 99 S.Ct. 2100 (level of process due for inmates being considered for release on parole includes opportunity to be heard and notice of any adverse decision); Hewitt, supra, at 473-476, 103 S.Ct. 864 (level of process due for inmates being considered for transfer to administrative segregation includes some notice of charges and an opportunity to be heard). Although Sandin abrogated Greenholtz's and Hewitt's methodology for establishing the liberty interest, these cases remain instructive for their discussion of the appropriate level of procedural safeguards.

The plaintiff received notice and an opportunity to be heard, but he had no inherent right to representation or staff assistance in presenting his arguments and defenses to

---

[5] Christianson v. Clarke, 932 F. Supp. 1178, 1182 (D. Neb. 1996), *citing* Sandin.

reclassification. He does not claim illiteracy or disability impeding his ability to exercise the opportunity to be heard.

Dismissed Misconduct Reports

The dismissal of misconduct charges does not render the underlying information irrelevant to the assessment of prison security risks. See generally Hewitt v. Helms, 459 U.S. at 474:

> As we said in Rhodes v. Chapman, 452 U.S. 337, 349 n. 14 (1981), "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators." In assessing the seriousness of a threat to institutional security prison administrators necessarily draw on more than the specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and longstanding relations between prisoners and guards, prisoners inter se, and the like. In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context, like that of those making parole decisions, turns largely on "purely subjective evaluations and on predictions of future behavior," ....

(Citation omitted.) Therefore, even if the plaintiff had a liberty interest at stake in this case, he had no constitutional right to prevent the defendants from considering information in dismissed charges and no entitlement to staff assistance to prevent the defendants from considering such information in a classification decision.

**Eighth Amendment**

Prolonged Administrative Confinement

Regarding the placement of the plaintiff in administrative confinement, the Eighth Amendment is violated by the denial of "the minimal civilized measure of life's necessities," or by incarceration under conditions "posing a substantial risk of serious harm." Simmons

13

v. Cook, 154 F.3d 805, 807 (8th Cir. 1998) (citation and internal quotation marks omitted). It is the "unnecessary and wanton infliction of pain" which constitutes cruel and unusual punishment forbidden by the Eighth Amendment. Hope v. Pelzer, 122 S.Ct. 2508, 2514 (2002). See also Phillips v. Norris, 320 F.3d 844, 848 (8th Cir. 2003):

> To sustain this claim, [the plaintiff] needs to show "unnecessary and wanton infliction of pain," as well as a deprivation "denying the minimal civilized measure of life's necessities." Wilson v. Seiter, 501 U.S. 294, 298 ... (1991) (internal quotations omitted). [The plaintiff] must also show that the defendants were deliberately indifferent to his health or safety, Farmer v. Brennan, 511 U.S. 825, 828 ... (1994), and that they acted maliciously for the purpose of causing him harm, Whitley v. Albers, 475 U.S. 312, 320-21 ... (1986).

In evaluating the constitutionality of challenged prison conditions under Eighth Amendment standards, the duration of harsh or restrictive conditions can constitute an important factor. See, e.g., Rahman X v. Morgan, 300 F.3d 970, 974 (8th Cir. 2002) ("Although [the plaintiff] was not allowed to go outside to exercise for three months, he was permitted to use a dayroom with exercise equipment for three hours each week during this time. This amount of exercise does not demonstrate deliberate indifference to the plaintiff's health. While Mr. X was housed in a segregation cell for quite a long time, the deprivations he alleges are not 'sufficiently serious' to establish an Eighth Amendment violation."). The factual allegations in the present case suggest that the plaintiff's segregation lasted for less than two years. Nonpunitive segregation for less than a two-year period is neither "unusual" nor "cruel" in the sense of unnecessary and wanton infliction of pain.

Failure to Protect

It is true that "[p]ersons involuntarily confined by the state have a constitutional right

14

to safe conditions of confinement." Osolinski v. Kane, 92 F.3d 934, 938 (9th Cir. 1996). However, "[n]ot every deviation from ideally safe conditions amounts to a constitutional violation." Id. The Eighth Amendment's prohibition against cruel and unusual punishment can be violated by a failure to take reasonable measures to guarantee the safety of an inmate from violence by other prisoners. See, e.g., Pagels v. Morrison, 335 F.3d 736, 740 (8th Cir. 2003): "The Supreme Court has held that the Eighth Amendment requires prison officials to take 'reasonable measures to guarantee the safety of inmates [and] ... to protect prisoners from violence at the hands of other prisoners.' Farmer v. Brennan, 511 U.S. 825, 832-33 ... (1994) (internal quotation marks and citations omitted)."

To prevail on an Eighth Amendment failure-to-protect claim, the plaintiff must show that (1) he was incarcerated under conditions posing a substantial risk of serious harm and (2) the defendant subjectively knew of and disregarded an excessive risk to the plaintiff's safety. Smith v. Arkansas Dep't of Correction, 103 F.3d 637, 644 (8th Cir. 1996); Jensen v. Clarke, 73 F.3d 808, 810 (8th Cir. 1996).

In order to satisfy the second part of a failure-to-protect claim, a defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Pagels v. Morrison, 335 F.3d at 740, citing Farmer v. Brennan, 511 U.S. at 837. In other words, "[a] government official violates the Eighth Amendment if he is deliberately indifferent to the need to protect an inmate from a substantial risk of serious harm from other inmates." Berry v. Sherman, 365 F.3d 631, 634 (8th Cir. 2004).

State tort law, not the Constitution, provides recompense for negligence or gross negligence by prison officials. See, e.g., Pagels v. Morrison, 335 F.3d at 742 ("negligence

15

cannot give rise to an Eighth Amendment failure-to-protect claim"); Tucker v. Evans, 276 F.3d 999, 1002 (8th Cir. 2002) (negligence, even gross negligence, is insufficient to prove a violation of the Eighth Amendment).

The factual allegations of the complaint do not give rise to an inference that any defendant subjectively acted, or failed to act, with deliberate indifference to the plaintiff's safety. An Eighth Amendment "violation cannot be established merely by the deprivation of a constitutional right; the plaintiff must also show that the official knew such action amounted to a constitutional violation." Turney v. Waterbury, 375 F.3d 756, 760 (8th Cir. 2004) (citation omitted).

Even if a defendant *should have known* of the risk, failure to discern what one should have perceived is no more than negligence. See Jackson v. Everett, 140 F.3d 1149, 1152 (8th Cir. 1998): "An 'official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.'"

The plaintiff has not alleged the "equivalent of criminal recklessness," Fisher v. Lovejoy, 414 F.3d 659, 662 (7th Cir. 2005), which is the exacting standard for deliberate indifference. "Indeed, an officer who actually knew of a substantial risk to a detainee's safety is free from liability 'if [he] responded reasonably to the risk, even if the harm ultimately was not averted, because in that case it cannot be said that [he was] deliberately indifferent.' .... 'The test of deliberate indifference ensures that the mere failure of the prison official to choose the best course of action does not amount to a constitutional violation.'" Id. (Citations omitted.)

The plaintiff has candidly included in his complaint the efforts taken by the

defendants to mitigate the risk posed by Sepulveda. However, in the plaintiff's view, the defendants did not do *enough* to protect him. His claims amount to negligence, not cruel and unusual punishment.

Qualified Immunity

Even if the complaint were considered to state a claim for relief under the Eighth Amendment, the defendants would be shielded by qualified immunity from the plaintiff's claims for damages. A governmental official, sued for damages in the official's individual capacity pursuant to 42 U.S.C. § 1983, is entitled to qualified immunity unless the plaintiff shows that the official violated the plaintiff's "clearly established" federal statutory or constitutional right(s). For a right to be considered "clearly established," the plaintiff must demonstrate that a reasonable person would have known: (a) of the plaintiff's right and (b) that the conduct at issue violated the plaintiff's right. See Anderson v. Creighton, 483 U.S. 635, 639-40 (1987): "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 640. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Id. (Citations omitted.)

Qualified immunity is the norm. "[The plaintiff's] burden is not easily discharged: 'That qualified immunity protects government actors is the usual rule; only in exceptional cases will government actors have no shield against claims made against them in their individual capacities.'" Foy v. Holston, 94 F.3d 1528, 1532 (11th Cir. 1996). "Stated another way, qualified immunity shields a defendant from suit if [the defendant] could have reasonably believed his or her conduct to be lawful 'in light of clearly established law and

17

the information [that the defendant] possessed .... The qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law."'" Smithson v. Aldrich, 235 F.3d 1058, 1061 (8th Cir. 2000).

Most of the defendants had no control over the assignment of the plaintiff or Sepulveda to any particular DCS institution. When he first attacked the plaintiff, two and one-half years after the plaintiff predicted he might, Sepulveda was immediately placed in segregation. When the plaintiff complained about Sepulveda's release from segregation into the plaintiff's housing unit, the defendants immediately moved Sepulveda to another housing unit. The plaintiff does not suggest that he ever requested protective custody. Even the plaintiff does not indicate what measures, in his view, should have been taken to protect him, other than a perpetual placement of Sepulveda in segregation, which the law does not allow. See Hewitt v. Helms, 459 U.S. 460, 477 n.9 (1983) ("Of course, administrative segregation may not be used as a pretext for indefinite confinement of an inmate.").

The relevant, dispositive inquiry for qualified immunity is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Saucier v. Katz, 533 U.S. 194, 202 (2001), *citing* Wilson v. Layne, 526 U.S. 603, 615 (1999). It is clearly established that a corrections officer who, with a subjectively culpable state of mind, fails to protect a prisoner from an objectively serious risk violates the Eighth Amendment. Pagels v. Morrison, 335 F.3d at 740, *citing* Prater v. Dahm, 89 F.3d 538, 541 (8th Cir. 1996). In this case, however, the complaint gives rise to no inference of a subjectively culpable state of mind suggesting that any defendant was aware that he or she was exposing the plaintiff to risk or failing to protect the plaintiff from attack. Thus, even

if the plaintiff's allegations could be considered to state an Eighth Amendment claim, the defendants are protected by qualified immunity for their subjective failure to perceive any imminent risk to the plaintiff's safety. The law was not "clearly established" that they should have acted differently.

    THEREFORE, IT IS ORDERED:

    1.    That filing no. 61, the defendants' Motion to Dismiss, is granted; and

    2.    That a separate judgment will be entered accordingly.

August 22, 2005.                             BY THE COURT:

                                                    s/ *Richard G. Kopf*
                                                    United States District Judge